May it please the court, Charles Savella on behalf of Appellant Mincoff. In this matter, I'd like to reserve two minutes for rebuttal. The rest of the argument will be with reference to the charges of a conspiracy to distribute, an attempted distribution for which Mr. Mincoff was convicted, along with two related telephone counts. This initial issue about a conspiracy to distribute brings into question the Ninth Circuit law concerning what constitutes an agreement to distribute the contraband and the buy-sell relationship. That is, a conspiracy has to constitute more than a buy-sell agreement, assuming there is an agreement between, in this case, Mr. Munoz and Mr. Mincoff, both of whom appear to be not actually either the source of supply or the ultimate consumer. One more time, Mr. Savella, what is my standard of review as to this appeal on these particular issues? With respect to questions of law, I would submit it's Well, we're not talking about questions of law here. We're talking about whether there's sufficient evidence to support the conviction, are we? Yes, it's Jackson v. Virginia and whether any reasonable jury could have found facts to support the elements of each of the crimes. And construing the evidence how? In a manner most favorable to the prevailing party. Granting the government all reasonable inferences that may be drawn from the evidence. Isn't that true? That's true. Isn't that true? Because at this point, the jury has already come to a conclusion, and therefore, if there's really any evidence there to help the jury get to that conclusion, we're kind of bound by the jury. If we're after the old judge, and I was one of those one of those days, then we are given de novo review, and we can beat him up as best we can. When we're talking about a jury, we're really giving every construction of the evidence, right? That's true. And what must the government prove for the conspiracy? It must prove in agreement to accomplish an illegal objective, correct? That's true, which is over and above. And intent, or an overt act, right? Correct. So can they prove that with circumstantial evidence? They certainly can. All right. If they can do that, then in this particular situation, I guess I'm trying to figure out how I can get where you want me to go when there looks to be an agreement for a large purchase, an agreement of very powerful stuff, some testimony in multiple recorded conversations showing that Minkoff was involved and that he intended to distribute. And if I get all of that in the evidence, how do I get around that very easy review? We would submit that, first of all, there was no agreement. As Mr. Munoz testified, Mr. Minkoff was shopping. And during the course of the 13 calls that are recorded, there is a steady change of circumstances about the potential. You're saying the jury could listen to what I read in this record and say there was never an agreement? There was never an agreement, correct, because the ---- If I look at the evidence and I give the jury the benefit of the doubt, you're saying there's just no way they could have found an agreement? That's correct. And the reason if I may ---- The evidence is right there in the record, what I read before I got here. That's true. And if I disagree, then you lose, right? If there are two or another person on the panel that agrees with you. All right, well, I'm just trying to lay it out here. That's pretty good evidence in those recorded conversations. Well, let's look at the evidence and compare it to the cases in the Ninth Circuit, such as the Lennock case, which says, even assuming, Your Honor is correct, that there is an agreement, and I would say that resorting ---- You've already conceded that there was intent to get cocaine, right? That's correct. There's no question that that reflects an intent. But just as an intent, for example, Mr. Munoz made an analogy to shopping for a vehicle. And if one of us calls a used car dealer and says, I'd like to buy a certain model of an automobile, and the dealer says, Well, I don't have any of those stock, I'll have to look. And over the course of the next ten days, there are 13 calls where they're debating how many doors, whether the model, maybe the number of vehicles. All of these things were in flux. In fact, with respect to those 13 calls, the way they devolved was that the first call was for six or seven kilos, which soon went to three, which soon went to one, which soon went to none. That is not the essence of an agreement. Second, Mr. Munoz himself said there could be no deal without an agreement on price or quality. And just as buying a used car analogy, Mr. Minkoff wasn't going to buy an automobile that was presented to him at any cost that Mr. Munoz could present it to him. There was going to have to be an agreement on cost. And when Mr. Munoz initially, excuse me, Mr. Minkoff suggested a price, Mr. Munoz responded with the word, nah. And the government agent said, that bespeaks of a disagreement on any consensus on price. And the reason would be this. A used car dealer has got to go out and find the vehicle because he doesn't have any. Mr. Munoz would have to go out and find a source of cocaine and buy it, or at least get it on consignment. He doesn't know what the cost is. As the agent said, the cost of a kilo of cocaine ran from $12,000 to $18,000. Mr. Minkoff had suggested a price of $15,500. Munoz said nah, meaning no, because he wasn't about to agree to a price that was going to be lower than his cost. Any more than a used car dealer would sell a car at a fixed price of, say, $15,500 when he has to go out and get it and pay more for that vehicle. Again, no agreement. All of these, the Yosen Thorn case which we cite, says these are material matters. Matters of quantity, quality, cost. Frankly, this doesn't really go to the UCC, but in the UCC you only got to agree to the quantity. Well, there was no agreement on quantity. I don't know. I guess we have to look at this. Well, I think that the calls will reflect the steady diminution of calls. It's like in the used car analogy, if the buyer said, I'd like five cars, the next call he says, well, I only want three cars. The next call he says, I only want one car. That hardly reflects an agreement between parties. But even assuming there is an agreement between parties, then we go to the doctrine of the buy-sell. In a conspiracy of buying and selling narcotics, there has to be more than just the buyer and the seller involved. Because as this circuit has stated in Lennock and other cases, if it's just that agreement, that would mean every sale of a narcotic could be deemed a conspiracy. No, but we do know that under our case law that the quantity can show that it's not for personal use. Alone, maybe not, but given the circumstances. No, actually, this court has said in Lennock, the mere fact that the defendant sold an alleged conspirator a quantity of cocaine too large for the personal use, therefore must have known the planning was to resell it, is insufficient to show a conspiracy. Without more. Without more. Yes, of course. That's what I said. Without more. So in this event, we have, all we have is an agreement. I'm assuming for the purposes of this argument, there's a buy-sell agreement, which this circuit has said without more. The cases, Lennock is an example. Lennock sold marijuana to people in low quantity amounts, and this court said it didn't make any difference, if I'm quoting it right, that they would further distribute them. Yes, that is a quote. It must show not only that Lennock gave the drugs to other people, knowing that they would further distribute them, but that he had an agreement with the person he sold it to for the further distribution. And that's what we lack here. Counselor, what significance is the portion of the recordings that talk about the buyers that Mr. Minkoff had? You know, he referenced that they were waiting, they had come to the area, they were getting antsy, they were getting ready to leave. How does that affect our analysis? Well, the question there would be, did Mr. Munoz have an agreement with Minkoff and those people for the sale that was? Now, one case says that Mr. Munoz would have to have an agreement with the ultimate buyers. I believe Lennock at 819 says, what I just read, that Lennock, to show a conspiracy, the government must show not only that Lennock gave drugs to other people, knowing that they would further distribute them, but that they had an agreement with these individuals to further distribute the drugs. In other words, to have a ---- Lennock says that the supplier has to have an agreement with the ultimate buyer. If you're going to have a conspiracy ---- What language in Lennock are you relying on to support your argument that the supplier has to have an agreement with the buyers? I believe that quote I just read from page 819, that the government must show not only that Lennock gave the drugs to other people, knowing that they would distribute them, but that he had an agreement with these individuals to further distribute the drugs. That's a quote on page 819. Not the individuals who were further distributing the drugs, but not the individuals who were buying the drugs from the person he sold them to. I don't ---- I think that's what the intent of that quote is, is that, and this is actually simpler. If I can simplify what I believe Lennock is saying, it says, if you're going to have a conspiracy beyond the buy-sell ---- You have to have an agreement between the buyer and the seller and other parties. And in this case, the government would argue, has argued in its brief, the other parties are the people that Minkoff is going to sell to. Otherwise, who are the other parties that are required outside the buy-sell agreement? Could you point me to exactly the language that you're talking about in Lennock? Because I thought it said, the government must show that the buyer and seller had an agreement to further distribute the drug in question, as opposed to bringing in to the agreement requirement the ultimate purchasers. Okay, I'm on 819. Circuits have held that proof that a defendant sold drugs to other individuals does not prove the existence of a conspiracy. This is starting at the beginning of 819. Then it cites the in-bank case from the Seventh Circuit in Lechuga, cited next, and a couple of other cases. Conspiracy requires proof of an agreement to commit a crime other than the crime of the sale itself. Right. Well, in this case, if there's going to be other people involved in the sale, who could that be? It either has to be people on the Minkoff side or the Munoz side. I don't have a problem with that. The problem I have is your representation that Lennock says there has to be an agreement between the supplier and the ultimate purchasers. I don't think Lennock says that. It seems to me that what it says, even with the language that you quote, is that all they have to do is have an agreement between each other, and one side is going to sell to somebody and they don't have to have an agreement with the original supplier, and one guy is just going to supply the drugs to him to sell to somebody, which it seems to me, based on the standard review, meets this test. I'm still trying to find the quote, but I would just say that beginning at the paragraph. I mean, the bottom line is, sir, there are plenty of cases in the Ninth Circuit to talk about, and we're now talking about what is a conspiracy. The government can prove the conspiracy with the existence that they act together to pursue a common goal. The government can prove the conspiracy with one overt act. It seems to me you're suggesting that we not only have to have one overt act by one of the two, but now I have to have an act by the supplier. Well, if the conspiracy is going on that end, I mean, there are multiple scenarios here for getting beyond the buy-sell between Minkoff and Munoz. One, an argument could be made that Minkoff was conspiring with Munoz and his suppliers. An argument could be made that Minkoff and Munoz were conspiring with Minkoff's purchase. What if Minkoff and Munoz were just conspiring with each other? Wouldn't that be enough? No, I think that's a buy-sell. That is the buy-sell doctrine. They were conspiring with each other, and Munoz knew that Minkoff was going to sell to other people. Isn't that enough? Nope. Well, what do you do with the language in LENOC that cites Linkari on page 819 that says, in a conspiracy to sell drugs, the supplier must know he is supplying a dealer? Okay. That's not enough. There has to be an agreement. There is specific language on this page 819 that says the fact that he knows that, for example, in this case Munoz knows that Minkoff, as is clear from the phone records, Minkoff is going to be selling his to somebody else. That does not make Munoz a conspirator with somebody else. It makes him a conspirator with Minkoff to distribute or sell a drug. Well, that's another question entirely. That's another question. He certainly is conspiring to distribute it to Minkoff. And he knows that Minkoff is going to distribute it to other individuals. He knows that because they discuss it. He knows that. There's no question in the record. He knows that. That's correct. And I believe that reading Minkoff's, excuse me, Lenach and Lechuga would say that more is required. There has to be the conspiracy between Munoz and these down the line. Okay. If we disagree with your reading of Lenach, do you lose? Well, I would then go to the example of the Thomas case, which you've also cited. Thomas is a Seventh Circuit case. But in that case, Mrs. Jones went to Thomas on seven occasions to buy distributable quantities of a narcotic within. I think it was. It may have been 10 days, but whatever. It was a abbreviated time period. Seven times. And the question was, was Thomas. Thomas was clearly conspiring to sell to Miss Jones. But was Thomas, knowing that there are other people down the line that she was distributing to, guilty of a conspiracy to distribute to down the line to Jones's customers? And the answer, although a jury convicted Thomas of that, the Seventh Circuit reversed under the Bicel Doctrine. There was no evidence showing an agreement between Thomas and Miss Jones's down the line customers. And so I would submit that in this case, we not only we don't have an agreement because of the varying over the course of these calls. Nothing is agreed upon other than Munoz is going to try to find a seller, which he cannot find over the time period. So it's like the used car salesman who can't find a car. Is there a sale? Is there an agreement to buy? No, there is not. Does the 2004 transaction enter this mix at all? It enters the mix, according to the government. But I don't think it establishes the conspiracy to distribute, which is dependent on the 2005 transaction. The government would argue that it has some relevance to color what was going on 18 months later, except for this. Munoz testified that that was a one time transaction and he thought it was over. And until Minkoff called out of the blue 16 or 18 months later for this deal, there was no ongoing conspiracy between them. He said as much so that that would refute the idea that there was some ongoing conspiracy between the two. And the great comparison between this case and in other cases, the Thomas case, where there was a repeated series of purchases by Mrs. Jones from Mr. Thomas over the course, I think was seven to 10 purchases. And the court said that still doesn't show an agreement between Thomas Jones and Mrs. Jones's down the line customers. So for that, those reasons, the linic and the linic line of authority that this this circuit has adopted, I would ask that the council wanted to fall for lack of proof of an agreement, lack of proof of anything beyond the buy sell arrangement, lack of an attempted distribution. And with those counts would fall the two related. We really haven't talked about attempted. No, but there's certainly I mean, the last deal was especially convincing on that. It wasn't any preparation, but a real attempt. They spoke 14 times. They discussed the deal and the details of the deal. And I thought pretty much they did everything except get the deal closed. But that make it an attempt. Well, the the operative and I think controlling doctrine here is from Yasin Thorn, which says to constitute an attempt, the conduct must unequivocally demonstrate the crime will take place unless interrupted by intervening circumstances. There was no ability for this crime to take place until Mr. Munoz could one find a source of supply, which he never was. So right there, there is no no facts to support the idea that the crime unequivocally will take place, except for an intervening circumstance. Then, assuming that an intervening circumstance, the fact that he couldn't get the drugs, that was the only thing that kept the crime from being committed. Well, what case says that? Well, Yasin Thorn is the quote Yasin Thorn doesn't say that. The only that you can't have an attempt just because you can't get the drugs. Well, that's your argument. You're saying that if I want to sell my car and the only thing that I can do, I go out and try to sell my car. There's really no attempt to sell the car because the other guy can't get the bank to give him the money. He couldn't get to really saying there's no attempt. Well, I didn't do anything. Well, the facts are that in this case, reading the 13 phone calls, there was no agreement on quantity. There was no agreement on price. And that those are the facts of Yasin Thorn, which Yasin Thorn says those are not mere ministerial facts. Those are facts that lead to the essence of the attempt. And without the without the cocaine in this case, without an agreement on quantity, which was steadily declining as the calls make, without an agreement on price. So there was I mean, the phone conversations show that there sort of was an agreement on price because they had a history. And the price was going to be the same as last time. So that's a clear enough agreement on price. And the other thing is in the prior transaction, it started off when I think eight and ended up with five kilos. So the quantity fluctuated between these people. The quantity was never fixed the first time, but the deal was consummated. So I don't understand why you think there's an impediment to finding an attempt because of those factors. Well, with respect to price, the July 24th call, which is the first call, Minkoff says if the numbers are right, meaning price, and he said fifteen five, which was the price from the previous year. And Munoz response now. And then the agent explains now would mean under those circumstances they hadn't agreed on a price. And the reason and a good reason for not agreeing on prices. Munoz couldn't give a price until he knew what he was going to pay for them, because he wasn't going to commit to Minkoff for a price that was less than he was paying for him. So that's the first and I think only discussion on price. Then the quantities go down to from. What about the recording that said I just assume doing with you if the numbers are right, because we didn't have any problem with them last time. Yes. Munoz testified that he and Minkoff were set on the price, the cocaine, and that price was fifteen five, the same as in 2004. Now, if the jury believed that, how do we undo that? I mean, if that's sufficient evidence for the if the jury believed that testimony from Munoz, how can we now say there's not sufficient evidence? The record of what was said between the parties is fifteen five. Munoz says now Minkoff is saying in that context, if the numbers are right, and then they never talk about price again because there's never any quantity to talk about price. But Munoz testified that they were set on the price. So if the jury believed that testimony, then how do we set aside that finding? Well, it's contradicted by his own statements in the tape recording. He said several years later on the witness stand a couple of things. He said it both ways. He said Minkoff was just shopping, that there was ambiguity. But then he did say on the redirect for the government, yes, I believe the numbers were set. But that doesn't mean that the record reflects from that recording that Minkoff had agreed to any number because they hadn't agreed on a number. He said not when Minkoff gave him a number and then they never discussed the number again because they couldn't discuss a number because Minkoff Munoz never got any. The count we're talking about here is not an attempt to buy. It's an attempt to distribute. Is that correct? The second count is an attempt at distribution, right, which in my argument since they didn't, there was never a possession. It makes it rather difficult to attempt to distribute something when they never had possession of anything to distribute. Well, attempt to distribute doesn't require possession, does it? I suppose it's conceivable that one could attempt to possess without the You can't distribute without ever touching it. There are millions of kingpins that distribute drugs without ever touching the drugs. That's true, but that presumes the existence of some drug. There was no drug here. But your statement was they never possessed it. That's true. They never possessed it because none ever existed. I think my time is long. Well, we'll give you some time. Thank you very much. Was anybody going to argue the McCabe? I was. Okay. That was your combined time, but we'll give you a few minutes. I was going to say he must be submitting McCabe, but I guess he's giving you more time. Go ahead. Good morning, Your Honor. May it please the Court, David Leshner for the United States. I would like to begin by directly answering the question regarding the holding of United States v. Lennox. That holding, I think, is most accurately summarized in footnote four, which is a direct quote. Mere sales to other individuals do not establish a conspiracy to distribute or possess with intent to distribute. Rather, the government must show that the buyer and the seller had an agreement to further distribute the drug in question. Neither Lennox nor any reported case in the Ninth Circuit or the Seventh Circuit or any other circuit that I have come across suggests or holds that a conspiracy to distribute must include an agreement with the ultimate street-level buyer. That is not the law of this circuit, and Lennox holds as much. But it isn't enough that you sell to somebody and know perfectly well that he's going to distribute. That is correct, and that is the holding of Lennox. And the facts of this case were sufficient to allow a rational jury to conclude that there was a common plan between Minkoff and Munoz that the cocaine would be distributed to Minkoff's, his guy, his buddy, his connection, the different ways in which Minkoff continually referred to his ultimate buyer. Both Minkoff and Munoz, they're not buyer-sellers. Both are middlemen, as stated in the appellant's briefing, as Mr. Savilla stated this morning. And that is the key to understanding why this was a conspiracy to distribute and why the argument regarding buy-sell does not have merit in our opinion. From the very beginning in 2004, and it is our view, Your Honor, because I believe you posed a question on this, the 2004 transaction is part of the conspiracy to distribute. There was, in that completed transaction, a fronting of drugs by Munoz. When he received the drugs from his source of supply, he fronted those drugs to Minkoff because Minkoff came, picked them up, left to take the drugs to his buyer, and came back with the buyer's money for the drugs. Now, there admittedly was more evidence at trial regarding the 2005 transaction because that was the subject of the wiretap recordings. And what is critical in analyzing the buy-sell issue in 2005 is, from the very first recorded call, Defendant Minkoff makes it clear that the cocaine is for his guy. It's not for Minkoff. And it is very clear from the calls that it is Minkoff's guy, his buddy, as he refers to him throughout these calls, is determining the quantity, how much he wants. At first it's six to seven. Then he brought two guys together. One of them, quote-unquote, bailed. I can only do three now. And finally, only down to one kilogram of cocaine. It is also clear from the calls, and the jury was entitled to find, that it was Minkoff's buyer that had the money. That's why he's a broker. He's not a buyer in the sense of the word Atlantic, and United States v. Thomas used that word. And I think the most telling phone call is the Thursday, July 28th phone call at SCR 59, in which Defendant Minkoff says, My guy is sitting right here in his house. He's sitting right here with me. He's got the paperwork for three. He's ready to roll. I really believe that phone call sums up this entire case, both with respect to the conspiracy to distribute, as well as the attempt. And I don't mean to jump around, but for the attempt, there was nothing more that Mr. Minkoff needed to do. The independent circumstance that prevented the deal from going down was the sole fact that Jesse Munoz couldn't come up with the cocaine. In Minkoff's own words, his buyer was ready to roll. And that is what, in our view, brings this case within the scope of United States v. Davis and United States v. Smith. Counsel, can you distinguish the Thomas case? I can, Your Honor. I believe that Mr. Sevilla accurately stated the general facts of that case. Thomas was a dealer of crack cocaine. He made approximately seven to nine transactions with Jones. And the Court of Appeals, Seventh Circuit, assumed that Thomas probably knew that Jones was going to further distribute the drugs. But there was no buy-sell relationship, and there are two things that really distinguish this case from that one. The first is that, in the Seventh Circuit words, Thomas had no shared stake in whatever Jones did with the drugs. And that is because, in each of those transactions, Jones paid cash up front, meaning Thomas made all of his money at the point of sale. Whatever may have happened, in terms of what Jones did with the drugs, was inconsequential to Thomas. Additionally, there was no sense of mutual trust between them, and those are the two key factors, I believe, that distinguish this case. Because here, the identity of Minkoff's buyer is irrelevant. We presented evidence it was a certain individual named Lincoln, but the identity doesn't matter. The existence, though, was critical. This was not a situation where Minkoff buys from Munoz, Munoz makes his money at the point of sale, and then Minkoff does whatever he wants to do with the drugs. That would be within the scope of Thomas, perhaps. But here, Minkoff is acting as a pure middleman, negotiating a deal from his buyer with the money to purchase the drugs. What makes a shared interest? I mean, of course they're both going to make money off the sale, but what's the shared enterprise? The shared enterprise is this, Your Honor, and perhaps I did not state it as articulately as I could have. It is the fact that it is Minkoff's buyer who is coming in with the money for the transaction. The entire essence of the deal is to provide the cocaine, not to Minkoff, because he's not the buyer, he doesn't have the money. He makes it very clear from the first call, the whole point of the deal is for his buddy, his guy, to be able to purchase the drugs. And when his guy is coming in with the money, that is what provides the shared stake that distinguishes this from Thomas. Is there any evidence that both Minkoff and Munoz shared in the financial? Well, Munoz, in the 2004 transaction, he took his share of $500 per kilogram. There is no evidence at trial in terms of what Minkoff's share would be or what financial arrangement he had worked out with his buddy, with his buyer. That was not included in the recorded telephone calls. And very briefly, the second thing that distinguishes this case from Thomas is there was mutual trust here, which is another one of the factors the Seventh Circuit looked to. And the Seventh Circuit did note that those factors are not exhausted, they're not all-inclusive, they're guidelines. In this case, in 2004, in the April or May 2004 deal, we in fact had fronting where Munoz gives the drugs to Minkoff, Minkoff leaves, returns two to three hours later with the money from his source. And that in fact was going to be the same situation with respect to the 2005 transaction, but for the fact that in one of the recordings, Minkoff tells Munoz, hey, do me a favor and run those in for me. And what that meant, according to Munoz, was Minkoff wanted Munoz, didn't want to go back and forth twice to pick up the drugs, bring them back to his buyer, bring the money back to Munoz. Minkoff wanted Munoz to simply bring the drugs to Minkoff and his buyer. So that does show a degree of mutual trust. But I really think the essence, Your Honor, in distinguishing Thomas, is the fact that it is clear from call number one on July 24, 2005, that the whole purpose of this transaction is to obtain cocaine for Minkoff's buyer. And that takes this case outside the purview of the buyer-seller rule. All right. Thank you. Thank you, Your Honor. Did you want to say anything else about any other? Are you going to let him argue McCabe afterwards, I guess? Yeah. I think, yeah, we'll give each one of you five minutes for McCabe. But first you have two minutes for rebuttal on this, and then you have your five minutes for McCabe and five minutes, and then we're done. Thank you, Your Honor. With respect to Munoz, Munoz testified that he was indifferent to Minkoff's buyers. There was no shared stake in the operation. That is, Munoz made his money from Minkoff on a cash sale. He had no interest in what Minkoff's downline purchasers were going to pay Minkoff. All he cared about was I'm going to make my money from Mr. Minkoff because I'm going to insist on cash on delivery in this 2005. He knew the money wasn't coming from Minkoff, but was coming from the buyer. Does that make a difference? Well, he probably did know it, but it doesn't make any difference because his interest was getting the cash. And in Thomas, they talked about this mutual to show that there may be a conspiracy over and abroad to buy-sell. They talk about the mutual trust of the parties, and they asked these factors in Thomas. Was Jones, the Minkoff character in that case, free to patronize other suppliers? And clearly, Minkoff was free to do that, establishing that there was not this tethered relationship showing a conspiracy of broader proportions than just this incidental buy-sell. Was Thomas, the Munoz character, under any obligation to meet Jones's need? Answer, no. Again, not establishing this mutuality of interest that was historically not present in this case or in Thomas. And did Jones pay in cash as opposed to credit? And in this case, it was a cash deal. It was in the 2004 as well. Well, but fronting is a little different than straight, you know, in-the-hand transaction. There was no fronting to occur in this case because it's clear that Minkoff said, come to my house, bring it here. All right. Okay, your time is up for, we understand your position in Minkoff. Thank you very much. So we can proceed to McKay. Five minutes, please. Yes. The issue capsulized by the government is it takes the questions put to Mr. McCabe on the end of the first day after Mr. Munoz has testified for a couple of hours, and then it takes the questions on the next morning on the 21st after Munoz has testified outside the present to say he's heard all this information about plea agreements and addendum on the street, including a fellow by the name of Joe Garcia. And then the questions are put to McCabe. The context of those scenarios, which I think are totally foundational to the court's mistaken ruling, is that Mr. McCabe was accused not of talking to his co-counsel about this case or even talking to them about Mr. Munoz in this case. He was accused of, not in effect, of distributing these to the street with an effort to intimidate Mr. Munoz. I mean, the question was pretty straightforward. I mean, without embellishing it with the circumstances, the question was pretty straightforward. Yes, it was. And the context of the question was, were you disseminating this information, and it came after the accusation by Munoz's attorney in Munoz that it was out to the street. And there was no evidence that he did anything of the sort. He was answering that question. No, he didn't answer the specific question that was posed. That's what created the difficulty. Right. You know, I might be more willing to take that contextual argument if, but for the second time after he's talked to co-counsel. Right. He's kind of appalled to find that co-counsel has sent this to his client, and then he goes back and the same question is asked again, and he says, no, I didn't distribute it. That's true. And the question is, under this circuit's doctrine of inherent authority, contempt or sanctions, there has to be a willfulness or a recklessness supported by bad faith. Now, are you really suggesting that this is a criminal contempt proceeding? No. Are you suggesting there's a case which says what the standard is or what the plaintiff has to prove in the civil contempt hearing? I mean, the bottom line is we have a civil contempt hearing here, really, don't we? It's not a criminal contempt hearing. It's not a criminal contempt. All right. And here we have the court who's trying to determine what to do, and what's the court's standard of review again? Abuse of discretion. So the court is trying to decide abuse of discretion here as to what to do in this situation, and it isn't criminal or we could have gone to jail. You did not challenge the amount, correct? No. So I guess I'm trying to figure out then on this particular matter why the court, you say, could say it's an abuse. When the district court said the second time in there, Mr. McCabe, you stand on your representation that neither you nor Mr. Garboth nor anyone on your staff circulated the plea agreement or any portions of it, absolutely. You also represent you did not communicate with others, including Mr. Garcia, that Munoz was cooperating. Absolutely. Right. Now, after all that had been through, in all this time, starting the day of the hearing to this point, you're saying that I could say the old court abused its discretion. Right. Why is it an abuse? Because the court- Don't talk to me about criminal contempt standards. I'm not. Don't talk to me about you seeing it a different way than the court. What case have I got that says this is abusive? Well, I would say the court was clearly erroneous in its fact-finding, and if it's clearly as erroneous in its fact-finding, then that would lead to a conclusion of abuse of discretion. Where was it clearly erroneous? It said that Munoz's status as a cooperator was a matter of speculation. The court itself at a hearing on October-excuse me-August 3rd, some 17 days prior to the trial, specifically used the words in the discovery proceeding when in open court, well, is the addenda and the plea agreement going to be given to Mr. McCabe as pursuant to discovery? And the government said yes. The whole point of this litany of- so the court's finding that it was just speculation that he was a cooperator is clearly erroneous. Mr. Munoz is- I don't know if that matters because in the prison system, documentation is paramount, and if someone in the prison system can get a copy of the actual plea agreement that proves in black and white that someone is cooperating, that is enough to order a hit on someone. And so whether or not there was a public record that he was a cooperator is a different issue than being able to get into the prison system the absolute proof that he was cooperating. So those are two separate issues in my view. If it's a public record, the essential document was the plea agreement in the Mafia case, number 1243, in which Munoz laid out in great detail the details of the Mexican Mafia. It wasn't the addendum. The addendum simply says you've agreed to cooperate in four cases, 1243 being one of them, and we're going to bring that to you. But it doesn't matter if the district court asks you, did you disseminate this to anyone? It doesn't matter if it was agreed upon in open court. Or if the court asks you a question about that, it doesn't matter that something was stated in open court. I don't understand why you make that decision. And what Mr. McCabe said at the hearing, what he should have said, is other than amidst co-counsel in the case, that is the court found five times that everybody in these related cases, they were related. The attorneys in these related cases met and under a joint defense agreement. He should have said, as he said with Ms. Gerboff, who was co-counsel with Mr. McCabe in the Ninkoff case. Was there a joint defense agreement in this? Yes, and Mr. McCabe testified to it. It wasn't in writing. And Mr. Katsurilis testified and filed declarations that he considered the statements that he and Mr. McCabe had about their clients were confidential. And why wouldn't they be? Mr. Vegasotto was a named co-conspirator in the case with Mr. Minkoff. So they would have a mutuality of interest in collaborating, which is exactly. It's true of the young lady who was – I mean, I just don't get the distinction. Well, he should have said – he said, this is the heat of battle. At the end of the first day, he's confronted by surprise with this accusation that he's distributing material to the street to intimidate Mr. Munoz, which was untrue. The worst that actually happened was that three days earlier, he let his office mate, who was representing Mr. Vegasotto, a charged – initially for one year, charged in the Minkoff case. And then – We don't know exactly what happened. I mean, the point is the district court was trying to get to the bottom of it. Well, we know exactly what happened because we had a hearing in front of the magistrate on what happened. Mr. Minkoff's attorney, Mr. McCabe, said to Mr. Katsourelis, who was representing Vegasotto, hey, first of all, they had discussions before that about Munoz was cooperating because as the affidavits in the record show, all the attorneys knew he was cooperating. They were able to pull down the plea agreement from the docket, which was far more persuasive about Mr. Munoz's cooperation than this addendum. But there it is. It's all public information. The government has said in public documents, he's our witness, he's our man in the Minkoff case. The government states to the court in open court in response to Judge Sobral's question, you're going to turn over the plea agreements and the addendum, right? And they do. What was the purpose of sending the plea agreement to the inmate? Mr. Katsourelis got a voluminous packet of discovery, and he thought he was just sending it off. He didn't do it with Mr. McCabe's consent. He just thought, well, this is routine because he said, I didn't know there was any restriction on sending a plea agreement on somebody who is obviously a cooperator, who the government has identified publicly as a cooperator. Why would there be a restriction? There was, evidently, although- No, there wasn't a restriction. There was just a question about what had been disseminated. There was not a restriction as far as I'm concerned. Well, the government represented there was a protective order on the addendum. The cooperation agreement is what you're talking about. The cooperation addendum, right. That was under seal. Yes. Never released to the public. Correct. All this idea that the plea agreement, public available, we know the plea agreement, but the cooperation agreement had never been released to the public. Then it was given to Mr. McCabe. He takes it back to his office. I would even say his counsel, cooperating counsel, comes in, which I don't see anything in the record which says there's a written agreement, but evidently some kind of agreement, and he not only talks about that, but then he says, I have the plea agreement. Do you want to see them? Costorilas goes in, locates the plea and the cooperation, and copies them all, both. Then he's asked these questions, and he says, absolutely, I didn't give any of it away. And one reason that he would be, his mindset, the accusation was more extensive than that. I think everyone would agree. The accusation was that he was disseminating to the street with the intent to intimidate him. Which makes it even more imperative that she clarify what exactly happened. Well, in the heat of battle, he should have said, he could have initially said, and as he said, I should have said, other than discussions with my co-counsel within the Skirboth and Joint Defense Council, I have not done anything of the sort that's been accused against me. Well, but he did know the second time around that the other guy had the stuff and had sent it out. And he still said, didn't do a thing. Well, one of the issues, yes, that's true. He should have said. At that point, he didn't have to say, oh, I've had conversation with counsel, but not only I had conversation with counsel, I let him very much copy the very thing you're after here, judge. And he sent it out. And he said nothing. He just said, I don't change my story one bit. And on an abuse of discretion standard, I'm supposed to say the good old judge was absolutely wrong. At the time that this took place on August 21st, Munoz, of course, had testified. The government had revealed he was a cooperating co-defendant. It doesn't say anything about revealed he's cooperating. The cooperation agreement is the big stuff when you're sitting there at district court. Not that he's a cooperating witness. He can get up on the stand, and they can hear what he's going to say. But what did he get for this, and what is the deal, and how are they going about it? Everything that's supposed to be in this cooperation agreement is not public knowledge. It certainly was by the time of Munoz's testimony. He got for it? Sure. All the things that were in the agreement is public knowledge? In cross-examination, there was great exploration of the detail. The example being? Why was it under seal? It was under seal because they are typically put as a matter of routine under seal. Well, that's the problem. He's breaking the seal of the court with no, absolutely no permission. And he won't tell anybody he did it. And you want me on an abuse of discretion standard to change that. I would say that the court below was wrong on its facts in saying that there was any material difference between what was in that cooperation agreement and what the court and the prosecutor and the defense had said weeks before in writing and in open court that he was a cooperator, that he was cooperating on the four cases, that the government is going to send the cooperation addenda to Mr. McCabe. This is all in open court. Now, let's assume there was material sent to the street after that because all of the attorneys would have had access to the plea agreements, including the Mexican Mafia plea agreement, which was not the Minkoff case, because they were downloadable from Pacer. Now, if all of that went to the street because the government had mistakenly made it available on Pacer or the government had put in its pleadings that Mr. Munoz was a cooperator and they were going to send over his cooperation addendum to Mr. McCabe and the court said in open court weeks before this hearing that we're sending over the addendum and the plea agreements, there was no question among the attorneys and their clients what Mr. Munoz's status. Mr. Vega Soto didn't need a cooperation addendum to know in writing that he was cooperating. All he had to do was look at the plea agreement to see how Mr. Munoz laid out the Mexican Mafia. But that doesn't change the fact that when a judge asks you a question in court, you have to be up front. Otherwise, the judge has no way of conducting proceedings or dealing with problems. If a judge asks you a question, you have to be frank and candid. Otherwise, the whole system just falls apart. Mr. McCabe said, you know, if I could handle it differently, I would have, because unlike other cases, the Kirk case, which you cited, where the attorney general had weeks between his misrepresentations and the court reversed his contempt sanction, Mr. McCabe had like 12 hours. He's under the stress. He's trying to represent Minkoff, who's on trial for a minimum mandatory 20-year sentence. Yes, he should have said, had he said, instead of limiting the plea, the scope of the privilege to Ms. Gerbath and said to other counsel in the related cases for which we've got joint defense agreements, there wouldn't have been an issue because that would have been privileged material. His discussion of a plea agreement with Mr. Katsourilis is privileged. Well, the district court may have seen it differently. The court did see it differently. We don't know how the district court would have looked at that because the information wasn't there. Your time has expired. Counsel. Briefly, Your Honor. The district court noted toward the end of its written order that it was a particularly unpleasant task to engage in the sanctioning of an attorney practicing before the court, and it is similarly so for the United States Attorney's Office to be in this position. However, we are in this position because of the conduct of that attorney, and regardless of how unpleasant it may be, this case presents a clear scenario of what is an unqualified duty, and that is the duty of candor to the court. And as the district court noted, and as Your Honor noted, justice is premised on a search for the truth, and when an attorney is asked a question by a court, there is an unqualified duty to respond completely and to respond truthfully, and that did not happen here. It did not happen on August 20th, on Monday, the first day of trial, and frankly, more disturbingly, nor did it happen on Tuesday, August 21st, the second day, after Mr. McCabe knew, even assuming he did not know before, that the agreements and cooperation agreement had been distributed to a member of the Mexican mafia within the Metropolitan Correctional Center. How did the information come to light that the information was actually distributed? When did the judge actually become aware that there was a misrepresentation or a lack of candor, however you want to phrase it? I think I understand your question, Your Honor. It came to light when MCC officials, in fact, retrieved the package containing the plea agreements and cooperation agreement that Mr. Katsurilas had dropped off for his client, Juvenal Vegas Soto, a member of the Mexican mafia. MCC officials did retrieve that package, and upon opening it, discovered that it contained the plea agreements and, more importantly, the cooperation agreement. At that point, it was brought to our attention, and this is within a week of following the trial. Does the record reflect at whose instance they retrieved it? The record did reflect that. There was testimony before the magistrate judge by Mr. Katsurilas that he initiated the efforts to retrieve the package following his conversation with Mr. McCabe. The record is also clear, Your Honor, that Mr. Katsurilas never explained to MCC officials what had happened and the reason why he sought to retrieve it. In fact, the testimony from Nelly Torres-Klein, the general counsel at the MCC, was that Mr. Katsurilas indicated to her that he had dropped off a material for the wrong client, and that's why he wanted to get it back. Well, then, who told the judge what? We're talking about after post-trial, Your Honor? So the U.S. Attorney's Office was apprised by the detention officials. That is correct. The agreement was in there, and you went to the court. We raised the issue with the court at that point, Your Honor. Counsel, between the time the question was asked of Mr. McCabe and the time that the U.S. Attorney went to the judge, did Mr. McCabe make any effort to contact the court after the heat of battle had dissipated to clarify that there was perhaps a misunderstanding regarding his answer to the court's question? No, Your Honor. Where did the first word come that something was out on the street? Was that just a statement by one of the other witnesses? It was not, Your Honor. Jesse Munoz was testifying on the first day of trial on August 20, 2007, and his attorney was present during his testimony, Mr. Mark Chambers. It was on that first day of trial that it was brought to the government's attention from Mr. Chambers through his client that there was a concern that the cooperation agreement was being disseminated and may be out on the streets. That's what stimulated the judge. It was at that point, and I do feel obligated to just make the quick point, at no point did government counsel rant and rail and accuse Mr. McCabe of doing something on August 20. As the district court found, and properly so, the counsel for the United States, in a non-accusatory fashion, raised the issue. This may be happening. This may have happened. We believe it affects this witness's demeanor. As the district court found, Munoz's trepidation and fear was palpable in this proceeding, and we requested that the court conduct an inquiry to determine the circumstances to correct the matter, if it had happened, and also determine the propriety of the jury instruction. And what happened here is that that was all frustrated by the responses provided on August 20 and August 21 by Mr. McCabe. Counsel, would you respond to opposing counsel's position that there was, that the finding of the district court was clearly erroneous because all of this information was public anyway? Yes, Your Honor. I will. It was not all public anyway. There was speculation, and it turns out, in hindsight, correctly so, that perhaps Mr. Munoz was cooperating because he was released on bail. There were statements, I believe he points to a statement we made where we agreed to produce the addenda. At no point did the government ever represent that Mr. Munoz was a cooperating witness. We did state at some point that Mr. Munoz would testify at trial. And more importantly, at no point did the government ever release Mr. Munoz's cooperation agreement to anyone. And most important of all, even if all of that is correct, and even if an attorney knows that, yes, everyone out there in the world knows that Mr. Munoz is cooperating, that does not, and it cannot, excuse the attorney from the unqualified duty of candor. That duty does not allow an attorney, any attorney, for the government or for the defense, to make determinations for himself or herself, well, I can shade this a bit because I know it's really not a big deal because other people already know about it. The district court properly found that Mr. McCabe intentionally or recklessly and in bad faith made material misrepresentations to the court. The court gave the cooperation agreement to Mr. McCabe. Was it given to other defense counsel in related cases? It was not, Your Honor, because Mr. Munoz did not testify in any other cases. And just to clear the record, it was the government's first appearance. His first and only. And we did produce the cooperation agreement in discovery as we were obligated to do under Giglio. All right, thank you, counsel. Thank you to both counsel. The case that's argued is submitted for decision by the court. That concludes today's calendar. We will be in recess until 9 o'clock a.m. tomorrow morning.
judges: Canby, Rawlinson, Smith N. R.